IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VERONICA SANFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. _____ |
| | ) | |
| HUMANA INC. d/b/a | ) | |
| HUMANA AT HOME, INC. | ) | |
| **Serve Registered Agent:** | ) | |
| C T Corporation System | ) | |
| 112 SW 7th Street, Suite 3C | ) | |
| Topeka, KS 66603 | ) | |
| | ) | |
| Defendant(s). | ) | |

## COMPLAINT

Plaintiff Veronica Sanford, by and through counsel, and for her causes of action against Defendant Humana, Inc., d/b/a Humana at Home, Inc. ("Defendant"), states and alleges the following:

## PARTIES

1.     Plaintiff Veronica Sanford is an individual residing at 23513 W. 73rd St., Shawnee, Kansas 66227, and she was an employee of Defendant for approximately seven years until her employment was wrongfully terminated on or about February 11, 2022.

2.     Plaintiff is a 42-year-old woman who suffers from diagnosed medical conditions including ADHD, complicated PTSD, complicated grief, generalized anxiety disorder, and depression.

3.     Defendant is a foreign for-profit corporation organized and existing under the laws of the State of Delaware and doing business in the State of Kansas where it provides health care services, information, and related insurance products.

1

4.      All of the acts, conduct, and omissions of Defendant were performed by its agents, representatives, and employees while in the course and scope of their agency or employment.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as the acts complained of involve violations of Plaintiff's rights under federal statutes, specifically the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*, and the Employee Retirement Income Security Act, § 510, 29 U.S.C. § 1140 ("ERISA").

6.      This Court has supplemental federal jurisdiction pursuant to 28 U.S.C. § 1367 to resolve Plaintiff's claims arising under Kansas law as the facts are so related to Plaintiff's federal law claims as to be part of the same case or controversy.

7.      Venue is proper within this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in the District, and the acts, transactions and events complained of herein and giving rise to Plaintiff's claims occurred in the District.

## FACTUAL ALLEGATIONS

8.      Plaintiff was employed by Defendant for nearly seven years as a Telephonic Nurse Care Manager before her employment was wrongfully terminated on or about February 11, 2022.

9.      Throughout Plaintiff's employment with Defendant, Plaintiff performed all duties of her job as required, exceeded the expectations of her position, and received praise, awards, and exceptional reviews for her work.

10.      Defendant was an "employer" of Plaintiff within the meaning of the FMLA, ERISA, and Kansas common law.

11.      Throughout her employment with Defendant, Plaintiff was subject to the control of Defendant as to the means and manner of accomplishing her work as an employee.

2

12.     Throughout her employment with Defendant, Plaintiff exercised her rights under the FMLA and ERISA, taking both continuous and intermittent leave under the FMLA and medical leaves of absence under Defendant's employee welfare benefits plan, to care for Plaintiff's own medical conditions or to provide care for a family member.

13.     Defendant is a covered employer under the FMLA in that it employs at least 50 employees within a 75-mile radius of Plaintiff's workplace.

14.     Defendant's employee welfare plan providing both short and long-term disability programs is governed by ERISA.

15.     Plaintiff had worked at least 1,250 hours during the twelve months immediately preceding the date her final FMLA leave began.

16.     Just prior to Plaintiff's unlawful termination, Plaintiff was on a qualified leave of absence under Defendant's employee welfare plan.

17.     In each instance Plaintiff exercised her rights under the FMLA and ERISA, Plaintiff was entitled to the requested leave and in each instance Plaintiff's FMLA and/or ERISA leave was approved by Defendant through its third-party benefits administrator, UNUM.

18.     During and after her employment with Defendant, Plaintiff experienced a pattern of retaliatory and adverse treatment in the terms and conditions of her employment including, but not necessarily limited to, the termination of her employment, the denial of severance packages and/or other post-employment benefits extended to other similarly-situated employees whose employment was terminated pursuant to Defendant's "reduction in force," a refusal to rehire Plaintiff in an alternative position following the termination of her Telephonic Nurse Care Manager position, a refusal to return to Plaintiff to her Telephonic Nurse Care Manager position despite telling Plaintiff such a position was available and that she was eligible to return to it, and

3

an unlawful submission of materially false information to the Kansas Department of Labor which interfered with Plaintiff's ability to receive post-termination unemployment benefits.

19.     When Plaintiff began her employment with Defendant in or around May 2015, Plaintiff was paid a base salary of $67,000.00 per year and was eligible for the following benefits: health insurance for Plaintiff and her children; vision insurance; dental insurance; a health savings and reimbursement account; tuition reimbursement; a discount on tuition with Spalding University; reimbursement of licensing and certification fees; a discount for cellular telephone service; a 401K with a matching contribution between 7%-9%; life insurance; long-term disability benefits; short-term disability benefits; and holiday pay and paid leave.

20.     In or around March of 2018, Plaintiff's position was converted from a salaried position to one that received an hourly rate of pay.

21.     At the time of Plaintiff's termination, Plaintiff's standard forty-hour-workweek and hour wages amounted to a potential income of more than $78,000.00 per year.

22.     In or around August 2018, the father of Plaintiff's two oldest children unexpectedly and tragically died.

23.     Following the loss of her loved one, Plaintiff requested and received approximately two-weeks of bereavement and caregiver leave.

24.     During this time, Plaintiff reached out to her supervisor, Abbey Egnew, and requested information regarding Defendant's FMLA leave program.

25.     Defendant failed to answer Plaintiff's request for information regarding FMLA and instead referred Plaintiff to Defendant's employee wellness program which also did not address Plaintiff's request for information regarding her rights under Defendant's FMLA leave policy.

26.     Accordingly, Plaintiff sought care on her own and returned to work just three weeks

after the sudden and traumatic loss of a loved one.

27.    On or about August 24, 2018, Plaintiff made a second request for information regarding Defendant's FMLA leave policy related to her and her sons' ongoing therapy appointments and because of a surgery Plaintiff's then seven-year-old son had scheduled.

28.    Once again, Defendant failed to respond to Plaintiff's request for information regarding Defendant's FMLA policy.

29.    Finally, on or around September 21, 2018, Plaintiff requested and finally received information regarding Defendant's FMLA leave policies.

30.    Specifically, Plaintiff was instructed to contact UNUM, Defendant's third-party administrator of its FMLA and ERISA-governed short and long-term disability benefits.

31.    On or about September 25, 2018, Plaintiff received a letter from Defendant's third-party benefits administrator which notified Plaintiff that she was approved for intermittent FMLA leave for the period of October 5, 2018, through March 15, 2019, but that her request for retroactive application for dates missed between August 2018 and September 2018 would not be approved.

32.    Plaintiff's intermittent FMLA benefits were then approved and recertified for the period of March 16, 2019, though September 15, 2019.

33.    Between August 28, 2018, and November 9, 2018, Plaintiff continued to work 40 hours per week but was still being required to use her intermittent FMLA benefits and/or paid-time-off to cover appointments.

34.    Because Plaintiff was still working forty-hour workweeks, Plaintiff requested that her supervisor not require Plaintiff to use her FMLA benefits or paid-time-off when she did have to attend appointments or miss time at work.

35.    Not only was Plaintiff's request denied, Plaintiff was also informed that because

neither FMLA leave nor paid-time-off were *actual* hours worked, the hours would not result in overtime and that Plaintiff would have to continue to utilize her FMLA entitlement and/or paid-time-off for hours spent in appointments regardless of whether she still worked forty-hour work weeks.

36.     Prior to Plaintiff's approved intermittent FMLA leave in September of 2018, Plaintiff and similarly situated employees were allowed to use paid-time-off or to "flex" time for appointments or other needs—put differently, when FMLA benefits were not in question, the hours Plaintiff worked did not matter so long as Plaintiff continued to satisfy Defendant's required 40-hour workweek.

37.     Despite the stress of working 40-hour workweeks and managing her and her children's serious medical conditions, Plaintiff continued to receive exceptional quality audits for her client calls as well as quality ratings on both her mid-year and end of the year reviews for 2018.

38.     In or around March 2019, while still approved for intermittent FMLA leave, additional traumatic events required Plaintiff to take a leave of absence under Defendant's short-term disability benefit from approximately March 25, 2019, until July 11, 2019.

39.     When Plaintiff returned to work on or about July 11, 2019 – and while Plaintiff was still approved for intermittent FMLA leave – Plaintiff was required to "start from scratch" in rebuilding a roster of members and was not allowed to resume treatment services for her preexisting book of members.

40.     At the time, Plaintiff's supervisor suggested striping Plaintiff of her existing book of members and requiring her to start over was a "good thing" because it would allow Plaintiff to have a less stressful return and would allow her "catch up" on matters that had taken place during her leave.

41.     However, when it came time for Plaintiff's annual review Plaintiff's supervisor attempted to place Plaintiff on a performance improvement plan, claiming Plaintiff was no longer hitting the same productivity metrics as she was before her leave.

42.     Plaintiff complained and wrote a written rebuttal of her performance evaluation.

43.     Based on Plaintiff's rebuttal, the negative performance evaluation was withdrawn, and Plaintiff was not required to go on a performance improvement plan.

44.     In approximately April of 2020, Plaintiff was placed under a new direct supervisor.

45.     Only a couple of months after beginning to work with the new supervisor, Plaintiff was accused of having an unusually high number of "hang ups" during calls with her members.

46.     Plaintiff's supervisor alleged these "hang ups" were a critical offense and that Plaintiff would be investigated by the company.

47.     Despite being cleared by a subsequent IT investigation of any wrongdoing, Plaintiff's new supervisor alleged Plaintiff's medical conditions made it impossible for her to perform the essential functions of her job and encouraged Plaintiff to take another medical leave of absence under Defendant's short and/or long-term disability program.

48.     Plaintiff's supervisor assured Plaintiff if she took the leave, she would suffer no long-term consequences to her employment.

49.     In or around March 2021, Plaintiff began making arrangements to return to work.

50.     Plaintiff's efforts were denied unless and until she was able to get a full release from her medical provider.

51.     At the time, however, both Plaintiff's medical providers and Defendant's third-party benefits administrator suggested Plaintiff be allowed to be phased back into work on a part-time basis.

52.     Defendant's benefit administrator even offered to continue to pay any difference between Plaintiff's part-time earnings and her full-time benefit payment.

53.     Defendant denied Plaintiff's medical provider's and its third-party benefits administrator's advice and refused to allow Plaintiff to return to work on a part-time basis.

54.     Over the course of the next several months, Plaintiff continued treatment efforts designed to return her to work on a full-time basis.

55.     In or around August 2021, Plaintiff received word from her supervisor that Defendant was in the midst of layoffs.

56.     Plaintiff's supervisor also informed Plaintiff that Defendant was initially courting voluntary resignations that would be rewarded with a severance package.

57.     Plaintiff's supervisor told Plaintiff that Plaintiff should consider taking a voluntary resignation now because if she did not do so, Plaintiff's supervisor believed the company would opt to terminate Plaintiff's position as part of its larger reduction in force.

58.     A few days later, before Plaintiff was able to make a decision regarding a voluntary resignation, Plaintiff's supervisor reached back out to Plaintiff and told Plaintiff to disregard her prior call, explaining that Plaintiff was not eligible for Defendant's severance offer because she was currently on a medical leave of absence under Defendant's employee welfare benefit.

59.     Plaintiff's supervisor refused to offer any other advice or insight regarding the long-term viability of Plaintiff's employment with Defendant.

60.     Plaintiff then reached out to Defendant's human resources department which informed Plaintiff that because she was on an approved long-term disability leave, her position was not within the scope of Defendant's layoffs, and therefore Plaintiff did not qualify for any severance package offers.

61.     Approximately two months later, in or around October 2021, Plaintiff received another call from Defendant's human resources department, was told her position was being eliminated effective January 3, 2022, and was offered an opportunity to participate in a voluntary resignation that would make her eligible to receive a severance package from Defendant.

62.     Plaintiff informed Defendant's human resources representative that she was told that because she was out on an approved medical leave of absence under Defendant's employee wellness benefit program, her position was safe and was necessarily outside of the scope of Defendant's layoff plans.

63.     At that point, Defendant's human resources representative suggested that the call with Plaintiff be taken "offline" while she gathered addition information.

64.     The next day, Plaintiff received in the mail an "Employee Transition" package that explained Plaintiff's eligibility for a post-employment severance package and other support options.

65.     The next day, Plaintiff received a call back from Defendant's human resources department and was told to disregard any communications regarding layoffs or severance benefits as Plaintiff was not subject to Defendant's layoffs because she was on an approved medical leave of absence.

66.     A few days later, Plaintiff began receiving calls from Right Management, a job assistance program associated with Defendant's severance and post-employment support options.

67.     Representatives from Right Management indicated they were hoping to set up a time with Plaintiff to discuss the services they were offering to Plaintiff as a laid off employee.

68.     Based on these conflicting messages, Plaintiff once again reached out to Defendant's human resources department and was once again assured that because she was on a

medical leave of absence, Plaintiff's position was not subject to Defendant's layoffs.

69.     Plaintiff complained that the mixed messages were resulting in significant emotional distress because Plaintiff no longer knew whether her employment with Defendant was secure and was also being told she did not qualify for Defendant's severance and/or post-employment support benefits.

70.     Defendant's agent apologized, assured Plaintiff her position was not being eliminated, and that Plaintiff was approved for leave until January 3, 2022 (the same date that prior communications indicated Plaintiff's position was going to be eliminated).

71.     Importantly, Defendant's representation that her medical leave was approved through January 3, 2022, was inconsistent with documentation from Defendant's third-party benefits administrator which had approved Plaintiff's leave until January 27, 2022.

72.     Over the course of the next two months, Plaintiff continued to receive calls from Right Management attempting to enroll Plaintiff in Defendant's post-employment benefits program.

73.     Based on Defendant's multiple representations that Plaintiff's job was not being eliminated and to disregard messages to the contrary, Plaintiff did not return the calls.

74.     On or about December 8, 2021, Plaintiff received another letter from Defendant, once again informing Plaintiff that her position would be eliminated effective January 3, 2022.

75.     Plaintiff called Defendant's human resources department and, for the first time, was told that despite being on a company-approved medical leave of absence, her employment was being eliminated effective January 3, 2022.

76.     On December 16, 2021, Plaintiff received a shipment of large, empty boxes from Defendant with instructions for returning her work computer and other company equipment.

77.     On December 17, 2021, Plaintiff received another shipment of large, empty boxes from Defendant with instructions for returning her computer and other company equipment.

78.     On December 21, 2021, Plaintiff met with her physician who tentatively cleared Plaintiff to return to work without physical restrictions.

79.     When Plaintiff attempted to direct this communication to her supervisor and Defendant's human resources department, Plaintiff was told that she was now under the supervision of an interim supervisor named Maria Davis.

80.     When Plaintiff reached out to her new, interim supervisor, the supervisor reiterated Plaintiff's position was being eliminated.

81.     When Plaintiff explained the months of mixed-messaging, Plaintiff's interim supervisor suggested she should talk to human resources.

82.     Plaintiff attempted to reach human resources that same day, but her call was not returned.

83.     On or about December 22, 2021, Plaintiff received an email asking if she had returned company equipment yet.

84.     Confused as to her job status and having still not heard back from Defendant's human resources department, Plaintiff did not respond.

85.     On or about January 5, 2022, Plaintiff received another communication regarding the status of her efforts to return Defendant's equipment.

86.     This time, Plaintiff replied, indicating she had not been officially terminated or released, pointing out Defendant's internal records still showed that Plaintiff was an active employee, and Plaintiff indicated she was still waiting on a return call from Defendant's human resources department regarding confusion as to her job status.

87.     The same day, Defendant's human resources department told Plaintiff that her approved leave only lasted until January 3, 2022, but that human resources had also received information indicating Plaintiff was cleared to return to work.

88.     Defendant's human resources department also represented that while Plaintiff was on approved leave under Defendant's employee welfare benefit, there had been a reduction in force in Plaintiff's department, that Plaintiff's position was not impacted by the reduction in force, but that, nonetheless, Plaintiff's position was still no longer available for her.

89.     Defendant's human resources department then told Plaintiff that Defendant had placed Plaintiff on approved, unpaid administrative leave after receiving notification that Plaintiff had been cleared to return to work, and that the period of unpaid administrative leave would run until January 26, 2022, so Plaintiff could attempt to find a new position within the Company.

90.     Not only was Plaintiff *not* offered any severance package or other post-employment benefits during that call, but two days later, on January 7, 2022, human representatives informed Plaintiff she was officially ineligible for any such benefits.

91.     Notwithstanding the mixed messages and the retaliatory treatment Plaintiff was receiving from Defendant, Plaintiff needed work and attempted to apply for open positions with Defendant.

92.     When Plaintiff did so, she was notified she was ineligible for any open positions with Defendant because she was still an active employee.

93.     Based on the incongruent messaging from Defendant, Plaintiff once again reached out to Defendant's human resources director to try to ascertain the nature of her job status.

94.     Defendant's human resources department advised Plaintiff that she was, in fact, still an employee of Defendant and would therefore need to use her work computer and employee

identification number to facilitate the application process.

95.    Plaintiff explained that she had previously been advised *not* to use her work computer because Plaintiff was on leave.

96.    Notably, Plaintiff was contemporaneously receiving frequent emails from Defendant demanding that she return the very equipment she was now being told was needed to find a new position with Defendant.

97.    Based on her communications with Defendant's human resources department, Plaintiff then attempted to use her work computer to apply for open positions, however, Plaintiff was locked out of Defendant's system, so Plaintiff once again had to contact Defendant's human resources department.

98.    Defendant's human resources department directed Plaintiff to Defendant's IT department.

99.    Plaintiff entered a "ticket" with Defendant's IT department regarding her challenges but was told that the ticket would likely not be responded to until at least January 9, 2022.

100.    Plaintiff then reached out to her interim supervisor.

101.    Plaintiff's interim supervisor informed Plaintiff that Plaintiff was locked out of her phone and computer based on Plaintiff's failure to timely return the same.

102.    Defendant's IT department told Plaintiff that because she was no longer in the same department, she would no longer be able to access Defendant's internal network using her old computer and that new equipment would have to be issued to her.

103.    Plaintiff requested alternative accommodations for the application process, noting that she was on an administrative leave deadline imposed by Defendant.

104.    Her requests were ignored and instead she received a call explaining the process by which new equipment would be sent to Plaintiff.

105.    On January 11, 2022, Plaintiff received a communication from Defendant's human resources department indicating that Plaintiff was on approved leave until January 26, 2022, but that if she was approved to return to work by her treating physician, Defendant would be returned to work in her prior position.

106.    On January 12, 2022, Plaintiff received a new laptop from Defendant.

107.    Plaintiff then reached out to her interim supervisor and Defendant's human resources department explaining that she was now being told that she would be returned to work.

108.    Plaintiff was instructed that the human resources representative that told Plaintiff she would be able to return to work was not the same representative that she had been working with and that Plaintiff should continue to look for new employment within the Company.

109.    On or about January 14, 2022, Plaintiff informed her interim supervisor she had begun looking for new, open positions with Defendant, but also wanted to know if there was any more information about Plaintiff being returned to her old position.

110.    Plaintiff also reminded her interim supervisor that her eligibility to seek reemployment with Defendant would expire on January 26, 2022, the date that her unpaid administrative leave was cut off.

111.    Plaintiff complained that this was unfair treatment, that she had received months of mixed messaging from Defendant, that she spent significant time locked out of the application department through no fault of her own, and that she had been denied any pay or benefits throughout this process, and was now being told by some members of human resources that Defendant was able and willing to return her to her old position effective January 26, 2022.

14

112.     Five days later, on January 17, 2022, Plaintiff was told her administrative leave would be extended until February 11, 2022, and that if, and only if, Plaintiff was able to find a new position with Defendant would Plaintiff receive retroactive benefits and/or pay for the period Defendant placed Plaintiff on administrative leave.

113.     Throughout the remainder of January 2022 and the beginning of February 2022, Plaintiff applied for more than a dozen open positions with Defendant that Plaintiff was qualified to perform.

114.     Plaintiff received one job interview during that time.

115.     The interview was set for 6:30 a.m. to make the hiring manager's travel to Las Vegas that same day more convenient.

116.     Despite the egregiously early start time, the hiring manager led Plaintiff to believe that, based on her qualifications and work history with Defendant, Plaintiff was the clear front-runner for the position.

117.     On Plaintiff's last day of administrative leave, February 11, 2022, Plaintiff was informed she was not being hired for the position because Plaintiff did not have a bachelor's degree.

118.     Notably, during Plaintiff's interview for the position, the interviewer/hiring manager for the position explained to Plaintiff that she also did not have a bachelor's degree but was currently working to achieve one and provided Plaintiff with information regarding the very same degree program.

119.     Importantly, Plaintiff ***was not*** told during the interview that a bachelor's degree was required for the position and the only reason Plaintiff was given information regarding a bachelor's degree program was because Plaintiff volunteered that she wanted to pursue her bachelor's degree

for future employment opportunities.

120.   The same day, February 11, 2022, Defendant's human resources department reached out to inform that that its prior representation that she could be returned to work effective January 26, 2022, was wrong.

121.   The same day, February 11, 2022, Plaintiff's interim manager reached out to Plaintiff to see if she still had any of the previously sent boxes for returning equipment because Plaintiff's interim manager was going to be going out of town and just wanted to make sure Plaintiff had boxes before she was left.

122.   Later that same day, but before being told her employment was being terminated, Plaintiff found out she was once again locked out her work computer and that she could no longer access Defendant's network or other employee resources.

123.   Eventually, Plaintiff was officially notified her employment was terminated effective February 11, 2022.

124.   Plaintiff was not offered a severance package or any other post-employment benefits.

125.   Even after terminating Plaintiff's position, Defendant's pattern and practice of retaliatory and disparate treatment continued.

126.   Despite applying for unemployment benefits almost immediately after being terminated from her position, as of May 3, 2022, Plaintiff had only received three weeks of unemployment benefits pay.

127.   Confused, Plaintiff reached out to the Kansas Department of Labor and an interview was set up for May 3, 2022, to determine Plaintiff's eligibility for unemployment benefits.

128.   During the May 3, 2022 interview, Plaintiff was informed by the Kansas

Department of Labor that Defendant had opposed Plaintiff's request for unemployment benefits, claiming Plaintiff had abandoned her position and failed to return to work after being medically cleared by her treating physician.

129.    Even after the Kansas Department of Labor determined Plaintiff was eligible for benefits, such benefits were only backdated to February 20, 2022, and took months to receive.

130.    Prior to and including Plaintiff's struggles to receive unemployment benefits from the Kansas Department of Labor, Plaintiff experienced a hostile, discriminatory, and retaliatory work environment that included a pattern of disparate treatment in the terms and conditions of her employment based on her lawful use of benefits under ERISA and the FMLA including, but not necessarily limited to: a denial of opportunities to participate in Defendant's severance package and/or other post-employment benefits; not being returned to her Telephonic Nurse Care Manager position upon being cleared to return to work despite being told that she would be; the termination of Plaintiff's employment; the failure to rehire Plaintiff for positions she was qualified to perform; and the unlawful submission of false information to the Kansas Department of Labor regarding the reason for Plaintiff's termination from employment.

131.    These adverse actions were taken without any legitimate reason and in violation of the law and those similarly situated employees who had not lawfully exercised their rights under ERISA or the FMLA were treated more favorably than Plaintiff.

132.    The true reason for the discriminatory and retaliatory employment actions by Defendant against Plaintiff were illegal retaliation for and/or interference with Plaintiff's lawful exercise of benefits under ERISA and the FMLA.

133.    At all times mentioned herein, Plaintiff was an "employee" of Defendant within the meaning of the FMLA, ERISA, and Kansas common law.

134.    Throughout Plaintiff's employment with Defendant, Plaintiff was subjected to unlawful retaliation and/or interference in violation of the FMLA and ERISA.

135.    During her employment with Defendant, Plaintiff met all qualifications for the position she held with Defendant and for those she applied for after being placed on unpaid administrative leave.

136.    Plaintiff's employment was illegally terminated on February 11, 2022.

**COUNT I – FMLA RETALIATION AND/OR INTERFERENCE**

137.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 136 above.

138.    Plaintiff engaged in protected activity by requesting Defendant provide her qualifying medical leave under the FMLA for her serious medical conditions and/or the serious health conditions of her children.

139.    Plaintiff in good faith attempted to exercise her rights with Defendant under the FMLA to take leave due to her own serious health conditions and/or the serious health conditions of her children.

140.    Defendant interfered with Plaintiff's ongoing requests for use of FMLA leave and/or retaliated against Plaintiff in the terms and conditions of her employment because of her requests to utilize FMLA leave by: denying Plaintiff opportunities to participate in Defendant's severance package and/or other post-employment benefits; not returning Plaintiff to her Telephonic Nurse Care Manager position upon Plaintiff being cleared to return to work despite telling Plaintiff she could and would be returned to work; terminating Plaintiff's employment; failing to rehire Plaintiff for positions she was qualified to perform; and  unlawfully submitting false information to the Kansas Department of Labor regarding the reason for Plaintiff's

termination from employment.

141.    Plaintiff's exercise of rights under the FMLA was a motivating and/or a determining factor in Defendant's decision to subject her to the adverse job actions set forth herein, including but not limited to the termination of Plaintiff's employment.

142.    Defendant's actions were willful, outrageous, and done with reckless indifference to Plaintiff's rights under the FMLA.

143.    Defendant failed to make good faith efforts to enforce its policies to prevent retaliation against their employees or interference with their employees' legal rights under the FMLA, including the rights of Plaintiff.

144.    As a direct and proximate result of Defendant's illegal actions, Plaintiff has sustained damages in the form of lost wages and benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to her reputation, loss of self-esteem, humiliation, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays for judgment in her favor against Defendant on Count I, and requests an award of her actual damages, including her lost wages and benefits and other monetary damages, with interest, through the date of trial, and damages for other nonpecuniary losses including damages for future lost wages and benefits, liquidated damages, all costs including reasonable attorneys' fees, equitable relief as appropriate, including but not limited to reinstatement, and any such other relief as the Court deems just and proper.

## COUNT II – ERISA RETALIATION AND/OR INTERFERENCE

145.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 144 above.

146.    Plaintiff engaged in protected activity by requesting Defendant provide her

statutorily protected benefits under Defendant's ERISA-governed employee welfare benefit package based on Plaintiff's serious health conditions.

147.    Plaintiff attempted in good faith to exercise her rights with Defendant under ERISA to take leave due to her own serious health conditions.

148.    Defendant interfered with Plaintiff's ongoing requests for use of statutorily protected ERISA benefits and/or retaliated against Plaintiff in the terms and conditions of her employment because of her requests to utilize statutorily protected ERISA benefits by: denying Plaintiff opportunities to participate in Defendant's severance package and/or other post-employment benefits; not returning Plaintiff to her Telephonic Nurse Care Manager position upon Plaintiff being cleared to return to work despite telling Plaintiff she could and would be returned to work; terminating Plaintiff's employment; failing to rehire Plaintiff for positions she was qualified to perform; and  unlawfully submitting false information to the Kansas Department of Labor regarding the reason for Plaintiff's termination from employment.

149.    Plaintiff's exercise of statutorily protected rights under ERISA was a motivating and/or a determining factor in Defendant's decision to subject her to the adverse job actions set forth herein, including but not limited to the termination of Plaintiff's employment.

150.    Defendant's actions were willful, outrageous, and done with reckless indifference to Plaintiff's rights under ERISA.

151.    Defendant failed to make good faith efforts to enforce its policies to prevent retaliation against their employees or interference with their employees' legal rights under ERISA, including the rights of Plaintiff.

152.    As a direct and proximate result of Defendant's illegal actions, Plaintiff has sustained damages in the form of lost wages and benefits, emotional pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, harm to her reputation, loss of self-esteem, humiliation, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays for judgment in her favor against Defendant on Count II, and requests an award of her actual damages, including her lost wages and benefits and other monetary damages, with interest, through the date of trial, and damages for other nonpecuniary losses including damages for future lost wages and benefits, liquidated damages, all costs including reasonable attorneys' fees, equitable relief as appropriate, including but not limited to reinstatement, and any such other relief as the Court deems just and proper.

## COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

153. Plaintiff incorporates by reference the allegations in paragraphs 1 through 152 above.

154. By making material misrepresentations regarding the status of Plaintiff's employment with Defendant, by denying Plaintiff equal access to post-employment benefits which were made available to similarly situated employees, and by obstructing Plaintiff's lawful attempts to apply for and receive unemployment benefits, Defendant should have realized that its conduct involved an unreasonable risk of causing Plaintiff emotional distress.

155. Defendant knew or should have known that Plaintiff, who was on a medical leave of absence at the time of Defendant's unlawful conduct, would suffer significant emotional distress as the terms and conditions of her employment with Defendant, including the future availability of employment with Defendant upon the expiration of her ERISA benefits, were repeatedly changed and/or misrepresented to Plaintiff by Defendant.

156. Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard of the rights of Plaintiff, thus justifying an award of punitive

damages in an amount sufficient to punish Defendant and to deter Defendant from like conduct in the future.

157.    As a direct and proximate result of the actions of Defendant, Plaintiff has suffered medically diagnosable and medically extreme and severe emotional distress.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendant on Count III, and requests an award of her actual damages, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), including but not limited to damages for emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to reputation, loss of self-esteem, humiliation and other nonpecuniary losses, punitive damages, all costs including reasonable attorneys' fees, equitable relief as appropriate, and any such other relief as the Court deems just and proper.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

158.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 157 above.

159.    Defendant acted intentionally and/or in reckless disregard of Plaintiff's rights by maliciously making material misrepresentations regarding the status of Plaintiff's employment with Defendant including, but not necessarily limited to whether Plaintiff's position would be eliminated by Defendant; by denying Plaintiff equal access to post-employment benefits which were made available to similarly situated employees; and by obstructing Plaintiff's lawful attempts to apply for and receive unemployment benefits.

160.    Defendant's conduct was extreme and outrageous.

161.    Defendant's actions caused Plaintiff severe and extreme emotional distress that resulted in bodily harm, including but not limited to, depression, loss of concentration and sleep,

and anxiety.

162.     These acts by Defendant were made in willful, wanton, malicious, and reckless disregard for the rights, privacy, and emotional well-being of Plaintiff, with knowledge of a likelihood that serious harm would arise from its conduct, and punitive and/or exemplary damages should be assessed against Defendant to punish it and to deter others who are similarly situated from committing similar wrongs.

163.     Defendant knew or should have known that Plaintiff, who was on a medical leave of absence at the time of Defendant's unlawful conduct, would suffer significant emotional distress as the terms and conditions of her employment with Defendant, including the future availability of employment with Defendant upon the expiration of her ERISA benefits, were repeatedly changed and/or misrepresented to Plaintiff by Defendant.

164.     Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard of the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendant and to deter Defendant from like conduct in the future.

165.     As a direct and proximate result of the actions of Defendant, Plaintiff has suffered medically diagnosable and medically extreme and severe emotional distress.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendant on Count III, and requests an award of her actual damages, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), including but not limited to damages for emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to reputation, loss of self-esteem, humiliation and other nonpecuniary losses, punitive damages, all costs including reasonable attorneys' fees, equitable relief as appropriate, and any such other relief as the Court

deems just and proper.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the trial site for this case.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**SEACORD LAW LLC**

*/s/  Nickalaus Seacord*
Nickalaus Seacord, Mo. Bar # 63232
1308 NE Windsor Drive
Lee's Summit, MO  64086
(T) 816.514.0414
nick@seacordlaw.com

***Attorney for Plaintiff Veronica Sanford***